IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

United States District Court
Southern District of Texas
FILED

MAR 0 2 2011

David J. Bradley, Clerk of Court

| | | |
|---|---|---|
| SPOT SHIPPING, LTD. | § | |
| | § | |
| VS. | § | |
| | § | C.A. NO. _____ |
| KOREA LINE (SINGAPORE) PTE, | § | |
| LTD, | § | [Admiralty - Rule 9(h)] |

## VERIFIED COMPLAINT AND PRAYER FOR RELIEF
## BY MARITIME ATTACHMENT BY SPOT SHIPPING LIMITED

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW Plaintiff, SPOT SHIPPING LIMITED (hereinafter "Spot Shipping"), and files this its Verified Complaint and claim and in support thereof, would respectfully show as follows:

### I.

### JURISDICTION

1.     This is a civil action within the admiralty and maritime jurisdiction conferred in Article III, Section 2, of the United States Constitution, pursuant to 28 U.S.C. § 1333, and Rule 9(h) of the Federal Rules of Civil Procedure, and Rule B of the Supplemental Rules for Certain Admiralty & Maritime Claims.  The Defendant Vessel and/or the substitute *res* is now or during the pendency of process hereunder will be within the jurisdiction of this Honorable Court.

### II.

### VENUE

2.     Venue is proper in this Court as the M/T BLUE EMERALD is located in and has been arrested in this jurisdiction.  Currently the M/T BLUE EMERALD is subject to arrest in C.A. 11-00622; *Valerie Shipping v. Korea Line (SINGAPORE) PTE, LTD*. (Judge David Hittner).

1

## III.

## PARTIES

3.     Plaintiff, Spot Shipping, is a corporation organized under the laws of the country of Turkey.  Its principal office is located at Kat 12, Blok A, Yapi Kred; Plaza, Buyakderc Caddes; Levent Mah, Besiktas, 34330 Istanbul, Turkey.

4.     Upon information and belief, at all times material, Defendant Korea Line (Singapore) Pte, Ltd. (hereinafter "Korea Line") was and is a business entity organized and existing under and by virtue of the laws of a foreign state, and is the registered owner of the M/T BLUE EMERALD.  Its principal address is 43-01, Hong Leong Building, 16, Raffles Quay, Singapore 048581.

5.     Defendant Korea Line cannot be found within this District within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims; however, on information and belief, Defendant has property, goods, chattels, or credits and effects that are now within the District, to wit:  the M/T BLUE EMERALD (IMO Number 9149723).  *See* C.A. 11-00622.

6.     Korea Line is subject to this Court's personal jurisdiction because it has purposefully availed itself to the jurisdiction of the courts of the United States by routinely doing business here in the form of chartering, managing, and operating vessels calling here and throughout other U.S. ports, including the M/T BLUE EMERALD, which is presently within the District. As is discussed in more detail below, the vessel is berthed in Houston, Texas, and so is subject to this Court's jurisdiction.

7.     The vessel, M/T BLUE EMERALD, has been arrested in this district and is subject to the jurisdiction of this court.

### III.

### PLAINTIFF'S CLAIMS

8.      Spot Shipping, by virtue of a contract dated March 11, 2008, on an amended NYPE form time charter party, time chartered the vessel M/V SPOT to Korea Line (Singapore) PTE, LTD. A copy of the relevant charter party ("Time Charter") is attached as Exhibit A.

9.      A dispute has arisen between Spot Shipping and Korea Line relating to Korea Line's performance under the Time Charter. This dispute involves the failure by Korea Line to pay charter hire due to Spot Shipping in the amount of $675,600.00 (USD). A copy of the statement of the delinquent account is attached as Exhibit B.

10.      Despite due demand, Korea Line has failed to pay or otherwise secure the amount which is presently due and owing to Spot Shipping. As a result of Korea Line's breach of the Time Charter Contract, Spot Shipping has and will continue to suffer damages in the total amount of the claim set forth above together with interest, costs and reasonable attorney's fees, solicitor's fees and arbitrator's fees.

11.      Through commercial and legal channels it has come to Spot Shipping's attention that an asset belonging to Korea Line, in the form the M/T BLUE EMERALD is now within the Southern District of Texas.

12.      Korea Line is not found within the Southern District of Texas, but Korea Line does have, or will have during the pendency of this proceeding, assets, property, goods, chattels or credits and effects which belong to it, is claimed by it or is being held for it or on its behalf within the district to wit: the M/T BLUE EMERALD (IMO Number 9149723), currently berthed at CEMEX USA, 5303 Navigation Boulevard, Houston, Texas 77001.

13.      Spot Shipping seeks an order from this Court directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplement Rules

for Certain Admiralty and Maritime Claims and any assets of Korea Line, namely the M/T

BLUE EMERALD, whether held by garnishees or not, for the purpose of obtaining personal

jurisdiction over Korea Line.

14.    Plaintiff reserves the right to amend and supplement this article of its claim and to

specify such other breaches as may become evident in the development of further facts.

## IV.

## DAMAGES

15.    As a direct and proximate result of the aforesaid breach of the Time Charter, Spot

Shipping has sustained damages, including but not limited to the total amount of the claim,

solicitor's fees, attorney's fees, arbitrator's fees, court costs, and related expenses.

16.    As nearly as can be estimated at present, Plaintiff's damages and losses will total

at least $675,600.00 (USD).

17.    The Time Charter provides for the recovery of interest and, as a result, the amount

claimed and recoverable increases daily.  Spot Shipping expressly reserves all its rights to claim

any and all additional sums howsoever arising as may be due and owing by Korea Line under the

Time Charter.

18.    Upon information and belief, all and singular, the above premises are true and

correct and within the admiralty and maritime jurisdiction of the United States of America and

this Honorable court.

## V.

## PRAYER

19.    WHEREFORE, Plaintiff SPOT SHIPPING, LTD. prays:

a) That process in due form of law may, pursuant to Rule B of the Supplemental Rules of Certain Admiralty & Maritime Claims and the rules and practices of this Honorable Court, may issue against Defendant, citing to appear and answer under oath all matters alleged;

b) That all persons claiming any right, title or interest in the M/T BLUE EMERALD said vessel may be cited to appear and to answer, upon oath, all and singular, the matters aforesaid;

c) That, pursuant to a Warrant of Attachment, the United States Marshal of this District arrest said vessel, and retain same under arrest pending the further orders of this Court;

d) Because Defendant cannot be found within the District, that the property, goods, chattels or credits and effects, namely the M/T BLUE EMERALD, be attached in this proceeding to the amount of the claim asserted herein under a Writ of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims;

e) This Court retain jurisdiction over Defendants through the attachment of the property, goods, chattels, or credits and effects, namely the M/T BLUE EMERALD, in order to be in the position to enter judgment upon any decree by this Court with respect to the disputes herein.

f) That a judgment may be entered in favor of Plaintiff against Korea Line Singapore PTE, LTD., *in personam,* for the damages claimed herein, plus pre-judgment interest, post-judgment interests, and costs, and that the M/T BLUE EMERALD may be condemned and sold, free and clear of all liens and encumbrances to satisfy the judgment against the Korea Line Singapore, PTE, LTD. and that this Court award Plaintiff out of the proceeds of said sale, the full amount of its damages, together with interest, court costs and attorney's fees;

g) That Plaintiff may have such other and further relief as the Court and justice may deem just and appropriate under the circumstance of the cause;

Respectfully submitted,

David R. Walker
Attorney-In-Charge
State Bar No.: 20696800
S.D.T.X. I.D.: 2827
Jay T. Huffman
State Bar No.: 24059980
S.D.T.X. ID: 870092
Royston, Rayzor, Vickery & Williams, L.L.P.
Pennzoil Place
711 Louisiana Street, Suite 500
Houston, Texas 77002
Telephone:  (713) 224-8380
Facsimile:  (713) 225-9945

ATTORNEYS FOR PLAINTIFF, SPOT
SHIPPING, LIMITED

OF COUNSEL:

ROYSTON, RAYZOR, VICKERY & WILLIAMS, L.L.P.

6

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | | |
|---|---|---|---|
| SPOT SHIPPING, LTD. | § | | |
| | § | | |
| VS. | § | | |
| | § | C.A. NO. _____ | |
| KOREA LINE (SINGAPORE) PTE, | § | | |
| LTD, | § | [Admiralty - Rule 9(h)] | |

## AFFIDAVIT

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF HARRIS | § |

BEFORE ME, the undersigned authority, on this day, personally appeared JAY T. HUFFMAN, who, being first duly sworn, deposed and stated that:

1.  I am a maritime lawyer with Royston, Rayzor, Vickery, & Williams, L.L.P., attorneys for Plaintiff in the above captioned matter.

2.  I have read the foregoing Verified Complaint and know the contents thereof.

3.  The same are true to the best of my knowledge except as to matters therein stated to be alleged upon information and belief, and, as to those matters, I believe them to be true. The sources of my information and grounds for my belief, as to the matters therein stated to be alleged upon information and belief, are records and documents of Plaintiff in my possession as one of their attorneys. The reason that this verification is not made by the Plaintiff is that it is a business organization and not a natural person and none of Plaintiff's officers or directors are currently within the District.

_____
Jay T. Huffman

Sworn to and subscribed before me this 2nd day of March, 2011.

_____
Notary Public in and for the
State of Texas

ROBIN E. GILPIN
Notary Public, State of Texas
My Commission Expires
SEPTEMBER 19, 2011

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| SPOT SHIPPING, LTD. | § | |
| | § | |
| VS. | § | |
| | § | C.A. NO. _____ |
| KOREA LINE (SINGAPORE) PTE, | § | |
| LTD, | § | [Admiralty - Rule 9(h)] |

## AFFIDAVIT

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF HARRIS | § |

BEFORE ME, the undersigned authority, personally came and appeared

JAY T. HUFFMAN

who, after being duly sworn, did depose and say that:

1.  I or at my direction, a diligent inquiry was conducted in order to determine whether or not the *in personam* Defendant in this action, Korea Line (Singapore) Pte Ltd., can be found within this District;

2.  The inquiry included review of local telephone directories, calls to the telephone directory assistance service, Port of Houston Business Directory, and Fairplay, a search of the Texas Secretary of State's official corporate database website and internet database searches via Google; and

3.  Based upon the results of the inquiries above listed, to the best of my knowledge, information and belief, the Defendant company cannot be found within the District within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims.

_____
Jay T. Huffman

Sworn to and subscribed before me this 2nd day of March, 2011.

ROBIN E. GILPIN
Notary Public, State of Texas
My Commission Expires
SEPTEMBER 19, 2011

_____
Notary Public in and for the
State of Texas



1ST ORIGINAL

# Time Charter

**GOVERNMENT FORM**

*Approved by the New York Produce Exchange*

November 6th, 1913 - Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946

1  **This Charter Party,** made and concluded in ......*Singapore*............ ...*11th*............... day of ...*March 2008*......... 19......

2  Between ...*Spot Shipping Ltd, Valetta, Malta*.....................................................................................................................................

3  Owners of the good ....*Maltese*............... Steamship/Motorship ..*SPOT (See Vessel's Description Clause 56)* ........ of......

4  ......*tons gross register, and* ...........................*tons net register, having engines of* ...........*indicated horse power*...

5  *end with hull, machinery and equipment in a thorough, efficient state, and classed* ....................................................

6  ........*of about*.............. ........*cubic feet bale capacity, and about*.......... ...........*tons of 2240 lbs.*

7  *deadweight capacity (cargo and bunkers, including fresh water and stores not exceeding one and one-half percent of ship's deadweight capacity,*

8  *allowing a minimum of fifty tons) on a draft of*............. *inches on*.......... *Summer freeboard, inclusive of permanent bunkers,*

9  *which are of the capacity of about*................ .......*tons of fuel, and capable of steaming, fully laden, under good weather*

10  *conditions about*.............. *knots on a consumption of about*.......... *tons of best Welsh coal best grade fuel oil best grade Diesel oil.*

11  now ...*In Zhejiang Shipbuilding Co., Ltd located in Ningbo City*.......................................................................................

12  ......*and Korea Line (Singapore) Pte Ltd, whose performance is to be guaranteed by KLC Corp, Seoul* Charterers of the City of *Singapore* .

13  **Witnesseth** That the said Owners agree to let, and the said Charterers agree to hire the said vessel from the time of delivery, for

14  *about a duration of about 35 up to about 37 months (about means +/- 15 days in Charterers' option) trading via safe port(s), safe*

15  *berth(s), safe anchorage(s), always afloat, always within Institute Warranty Limits, except NAABSA 2 times per annum basis River Plate*

16  *only as per NYPE Clause 6* within below mentioned trading limits.

16  Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter, but Charterers remaining responsible for

17  the fulfilment of this Charter Party. *Acceptance of delivery of the vessel shall not constitute any waiver of Charterers' rights under this*

*Charter Party.*

18  Vessel to be placed at the disposal of the Charterers, at *on dropping dock master ex Ningbo shipbuilding yard, China,* any time day or night, ...

19  *Sundays and Holidays included. Owners to serve 30/20/15/10/7 days approximate and 5/3/2/1 day(s) definite notice of delivery.*

20  *in such dock or at such wharf or place (where she may safely lie always afloat at all times of tide, except as otherwise provided in clause No. 6) as*

21  *the Charterers may direct. If such dock, wharf or place be not available time to count as provided in clause No. 5.* Vessel on her delivery to be

22  *ready to receive cargo with clean swept holds and* Vessel to be light, staunch, strong and in every way fitted for the lawful ordinary cargo service, for

23  *the currency of this time charter service, having water ballast, winches and*

23  *donkey boiler with sufficient steam power, or if not equipped with donkey boiler, then other power sufficient to run all the winches at one and the same*

24  *time (and with full complement of officers, seamen, and engineers) and firemen for a vessel of her tonnage), to be employed, in carrying lawful merchan-*

25  *dise, including petroleum or its products in proper containers, excluding* ...... *See Cargo Exclusion Clause 35*...

26  *(vessel is not to be employed in the carriage of Live Stock, but Charterers are to have the privilege of shipping a small number on deck at their risk,*

26  *all necessary fitting and other requirement to be for account of Charterers) in such lawful trades, between safe port and/or ports in British North*

27  *America and/or United States of America, and/or West Indies, and/or Central America, and/or Caribbean Sea, and/or Gulf of Mexico, and/or*

28  *Mexico, and/or South America*

29  *and/or Africa, and/or Asia, and/or Australia, and/or Tasmania, and/or New Zealand, but excluding Magdalena River, River St. Lawrence between*

30  *October 31st and May 15th, Hudson Bay and all unsafe ports, also excluding, when out of season, White Sea, Black Sea and the Baltic.*

31  *See Trading Exclusion Clause 34.*



EXHIBIT
A

as the Charterers or their Agents shall direct, on the following conditions:

1. That the Owners shall provide and pay for all provisions, wages *including overtime except immigration of vessel's crew* and consular shipping and discharging fees of the Crew; shall pay for the insurance of the vessel, *unless otherwise stated* also for all the cabin, deck, engine-room and other necessary stores, including boiler water and maintain her class and keep the vessel in a thoroughly efficient state in hull, machinery and equipment for and during the service.

2. That *whilst on hire* the Charterers shall provide and pay for all the fuel except as otherwise agreed, Port Charges, *compulsory and customary* Pilotage, *canal, seaways, rivers, steersmen, boatage, lights, tug assistance, dock and other dues and charges,* Agencies, Commissions. Consular Charges (except those pertaining to the Crew and/or *flag of vessel*), and all other usual expenses except those before stated, but when the vessel puts into a port for causes for which vessel is responsible, then all such charges incurred shall be paid by the Owners. Fumigations ordered because of illness of the crew to be for Owners account. *(See Clause 40).* Fumigations ordered because of cargoes carried or ports visited while vessel is employed under this charter to be for Charterers account. All other fumigations to be for Charterers account after vessel has been on charter for a continuous period of six months or more. *Owners to provide and keep onboard valid deratisation or derating exemption certificate throughout the timecharter period.*

Charterers are to provide necessary dunnage and shifting boards, also any extra *cargo* fittings requisite for a special trade or unusual cargo, ~~but Owners to allow them the use of any dunnage and shifting boards aboard vessel. Charterers to have the privilege of using shifting boards for dunnage, they making good any damage thereto.~~

3. ~~That the Charterers at the port of delivery, and the Owners at the port of re-delivery, shall take over and pay for all fuel remaining on board the vessel at the current prices in the respective ports, the vessel to be delivered with not less than ...... tons and not more than ...... tons and to be re-delivered with not less than ...... tons and not more than ...... tons.~~ *See Clause 3A.*

4. That the Charterers shall pay for the use and hire of the said Vessel at the rate of *USD38,800 gross daily payable every 15 days in advance* ~~United States Currency per ton on vessel's total deadweight carrying capacity, including bunkers and stores, on~~ ~~Summer Freeboard, per Calendar Month,~~ commencing on and from the day of her delivery, as aforesaid, and at and after the same rate for any part of a *day* month; hire to continue until the hour of the day of her re-delivery in like good order and condition, ordinary wear and tear excepted, to the Owners (unless lost) *on dropping last outward sea pilot safe port or passing in Charterers' option: Skaw / Gibraltar including Morocco, full Mediterranean including Black Sea, Durban / Dakar range, Mombassa / Maputo range, Montreal / Valparaiso in Bahia Blanca including US Gulf/North Coast South America / Caribbean in Charterers' option, Vancouver / Valparaiso in Charterers'option, Aden/Muscat excluding Persian Gulf / Japan including South East Asia/People's Republic of China / Taiwan unless otherwise mutually agreed, Charterers are to give Owners not less than 30/20 days notice of vessels expected date of re-delivery, and probable port and 10/7/5/3/2/1 days notice of port and time of redelivery. (See Clause 52)*

5. *Payment of said hire to be made in New York* in cash in United States Currency, semi-monthly in advance, and for the last half month or part of same the approximate amount of hire, and should same not cover the actual time, hire is to be paid for the balance day by day, as it becomes due, if so required by Owners, unless bank guarantee or deposit is made by the Charterers, otherwise failing the punctual and regular payment of the hire, or bank guarantee, or on any breach of this Charter Party, the Owners shall be at liberty to withdraw the vessel from the service of the Charterers, without prejudice to any *fundamental* claim they (the Owners) may otherwise have on the Charterers. ~~Time to count from 7 a.m. on the working day following that on which written notice of readiness has been given to Charterers or their Agents before 4 p.m., but if required by Charterers, they to have the privilege of using vessel at once, such time used to count as hire.~~ *(See Clause 54)*

Cash for vessel's ordinary disbursements at any port may be advanced as required by the Captain, by the Charterers or their Agents, subject to 2 1/2% commission and such advances shall be deducted from the hire. The Charterers, however, shall in no way be responsible for the application of such advances.

6. That the cargo or cargoes be laden and/or discharged in any *safe* dock or at any *safe* wharf or *safe* place that Charterers or their Agents may



direct, provided the vessel can safely lie always afloat at any time of tide. ~~except at such places where it is customary for similar size vessel to safely~~ ~~lie aground.~~ *(See Clause 34)* 69 70

7. That the whole reach of the Vessel's Hold, Decks, and usual places of loading (not more than she can reasonably stow and carry), also accommodations for Supercargo, if carried, shall be at the Charterers' disposal, reserving only proper and sufficient space for Ship's officers, crew, tackle, apparel, furniture, provisions, stores and fuel. ~~Charterers have the privilege of passengers as far as accommodation allow. Charterers~~ ~~shall pay....................per day per passenger for accommodations and meals. However it is agreed that in case any fines or extra expenses are~~ ~~paying Owners.............................................................................................................Charterers are to bear such risk and expense. No passengers allowed.~~ ~~incurred in the consequence of the carriage of passengers.~~ 71 72 73 74 75

8. That the Captain shall prosecute his voyages with the utmost despatch, and shall render all customary assistance with ship's crew and boats. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and agency; and Charterers are to ~~load, stow, and trim, the cargo at their expense~~ *arrange and pay for loading, dunnaging, lashing, securing, unlashing, tally, trimming, stowing, unloading, weighing and delivery of cargos, survey on hatches and any other surveys on cargo* under the supervision of the Captain, who is to sign Bills of Lading for cargo as presented, in conformity with Mate's or Tally Clerk's receipts. *See Clause 39.* 76 77 78

9. That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on receiving particulars of the complaint, investigate the same, and, if necessary, make a change in the appointments. 79 80 81

10. That the Charterers shall have permission to appoint a Supercargo, who shall accompany the vessel *at his own risk* and see that voyages are prosecuted ~~with the utmost despatch. He is to be furnished with free accommodation, and same fare as provided for Captain's table, Charterers paying at the~~ *with the utmost despatch.* He is to be furnished with free accommodation, and same fare as provided for Captain's table, Charterers paying at the rate of $10.00 per day. ~~Owners to victual Pilots and Customs Officers, and also when authorized by Charterers or their agents to victual Tally~~ ~~Clerks, Stevedore's Foreman, etc. Charterers paying at the current rate per meal, for all such victualling. (See Clause 66)~~ 82 83 84 85

11. That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, and the Captain shall keep a full and correct Log of the voyage or voyages, which are to be patent to the Charterers or their Agents, and furnish the Charterers, their Agents or Supercargo, when required, with a true copy of daily *abstract Logs* showing the course of the vessel and distance run and the consumption of fuel. *(See Clause 42)* 86 87 88 89

12. That the Captain shall use diligence in *the care and custody of* ~~caring for~~ the ventilation of the cargo. *Vessels holds have natural ventilation only.* 90

13. ~~That the Charterers shall have the option of continuing this charter for a further period of....................................................................................~~ ~~on giving written notice thereof to the Owners of their Agents......................days previous to the expiration of the first named term, or any declared option.~~ 91 92 93

14. That if required by Charterers, time not to commence before ..........00:01 local time 1st September 2008........................................... and should vessel not have given written notice of readiness on or before .........21:59 local time 30th October 2008...................~~but not later than 4 p.m. Charterers or~~ ~~their Agents to have the option of cancelling this Charter at any time not later than the day of vessel's readiness.~~ *Owners to narrow delivery to a 15 day spread 10 days prior first day of layday. At any time before delivery, if the Owners give notice to Charterers informing them with the new delivery date due to the reasons beyond their control, Charterers have 48 business hours time to accept the new cancelling date or to cancel (rescind) this Charter Party. Should the vessel be further delayed, Owners shall be entitled to request as above.* 94 95 96

15. That in the event of the loss of time from deficiency and/or default of crew or Officers and/or deficiency of men or stores, fire, breakdown or damages to hull, machinery or equipment, grounding, detention by average accidents to ship or cargo, drydocking for the purpose of examination or painting bottom, or by any other cause *not excepted in this Charter Party* preventing the full *use of the Vessel to Charterers* ~~working of the vessel,~~ the payment of hire shall cease for the time thereby lost; and if upon the voyage the speed be reduced by defect in or breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost of any extra *bunkers* fuel consumed in consequence thereof, and all extra expenses shall be deducted from the hire. 97 98 99 100 101 102

16. *See Clause 70.* ~~That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of)~~ ~~shall be~~ ~~returned to the Charterers at once.~~ The act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Seas, 103



104 Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted.
105 The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the
106 purpose of saving life and property.
107 17. ~~See Clause 63. That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to three persons at~~
~~New York.~~

108 ~~one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision, or that of any two of them, shall be final, and for~~
109 ~~the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be commercial men.~~
110 18. That the Owners shall have a lien upon all cargoes, and all sub-freights *belonging to the timecharterers and any Bill of Lading freight*
*and any claims* ~~for any amounts~~ *due under this Charter, including General Aver-*
111 ~~age contributions, and the Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess~~
112 ~~deposit to be returned at once. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which~~
113 ~~might have priority over the title and interest of the owners in the vessel.~~
114 19. That all *salvage and assistance to other vessels to be for Owners and Charterers equal benefit after deducting the Master's and*
*crew's proportion and all legal and expenses including hire paid under Charter for time lost in salvage also repairs of damage and fuel*
*consumed. The Charterers to be bound by all measures taken by Owners in order to secure payment of salvage and to fix its amounts* ~~and~~
~~devices and salvage shall be for Owners and Charterers' equal benefit after deducting Owners' and Charterers' expenses and~~
~~Crew's proportion.~~ General Average shall be adjusted, stated and settled *in London*, according to Rules 1 to 15, inclusive, 17 to 22, inclusive, and Rule F
of
115 ~~York-Antwerp Rules 1994 and/or modifications thereof~~ 1924, at such port or place in the United States as may be selected by the carrier, and as to
116 ~~matters not provided for by these~~
117 ~~Rules, according to the laws and usages at the port of New York. In such adjustment disbursements in foreign currencies shall be exchanged into~~
118 ~~United States money at the rate prevailing on the dates made and allowance for damage to cargo claimed in foreign currency shall be converted at~~
119 ~~the rate prevailing on the last day of discharge at the port or place of final discharge of such damaged cargo from the ship. Average agreement or~~
120 ~~bond and such additional security as may be required by the carrier, must be furnished before delivery of the goods. Such cash deposit as the carrier~~
121 ~~or his agents may deem sufficient as additional security for the contribution of the goods and for any salvage and special charges thereon, shall if~~
122 ~~required be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery. Such deposit shall, at the option of the~~
123 ~~carrier, be payable in United States money and be remitted to the adjuster. When so remitted the deposit shall be held in a special account at the~~
124 ~~place of adjustment in the name of the adjuster pending settlement of the General Average and refunds or credit balances, if any, shall be paid in~~
125 ~~United States money.~~
126 ~~In the event of accident, danger, damage or disaster, before or after commencement of the voyage resulting from any cause whatsoever,~~
127 ~~whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract or otherwise, the~~
128 ~~goods, the shipper and the consignee, jointly and severally, shall contribute with the carrier in general average to the payment of any sacrifices, losses~~
129 ~~or expenses of a general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the~~
130 ~~goods. If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully and in the same manner as if such salving ship or~~
131 ~~ships belonged to strangers.~~ New Jason Clause as attached. Hire is not to contribute to General Average.
132 Provisions as to General Average in accordance with the above are to be included in all bills of lading issued hereunder.
133 20. Fuel used by the vessel while off hire, also for ~~cooking, condensing water, or for grates and stoves to be agreed to as to quantity, and the~~
134 ~~cost of replacing same, to be allowed by Owners.~~
135 21. ~~That as the vessel may be from time to time employed in tropical waters during the term of this Charter. Vessel is to be docked at a~~
136 ~~convenient place, bottom cleaned and painted whenever Charterers and Captain think necessary, at least once in every six month, reckoning from~~
137 ~~time of last painting and payment of the hire to be suspended until she is again in proper state for the service.~~
138 *See Clause 43.*
139 .................................................................
140 22. Owners shall maintain the gear of the ship as fitted, providing gear (for all derricks) capable of handling lifts *as per Clause 56* up to three tons,
also
141 providing ropes, falls, slings and blocks *as per vessel's specifications*. ~~If vessel is fitted with derricks capable of handling heavier lifts. Owners are to~~
~~provide necessary gear for~~
142 ~~same, otherwise equipment and gear for heavier lifts shall be for Charterers' account.~~ Owners also to provide on the vessel *electric light* ~~lanterns and oil~~



143 for
night work, and vessel to give use of electric light ~~as on board~~ when so fixed, but any additional lights over those on board to be at Charterers' expense.
The

144 Charterers to have the use of any gear on board the vessel.
145 23. Vessel to work night and day, if required by Charterers, ~~and all winches to be at Charterers' disposal during loading and discharging;~~
146 ~~steamer to provide one winchman per hatch to work winches day and night as required. Charterers agreeing to pay officers, engineers, winchmen,~~
147 ~~deck hands and donkeyman for overtime work done in accordance with the working hours and rate stated in the ship's articles. If the rules of the~~
148 ~~port or labor union, prevent crew from driving winches, shore Winchmen to be paid by Charterers. In the event of a disabled winch or winches or~~
149 ~~insufficient power to operate winches, Owners to pay for shore engine or engines in lieu thereof, if required, and pay for any loss of time occasioned~~
150 ~~thereby.~~ No winchmen/cranemen from vessel's crew. All winchmen/cranemen to be provided and paid by Charterers
151 24. It is also mutually agreed that this Charter is subject to all the terms and provisions of and all the exemptions from liability contained
152 in the Act of Congress of the United States approved on the 13th day of February, 1893, and entitled "An Act relating to Navigation of Vessels;
153 etc." in respect of all cargo shipped under this charter to or from the United States of America. It is further subject to the following clauses, both
154 of which are to be included in all bills of lading issued hereunder:

155                                    U. S. A. Clause Paramount
156 This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April
157 16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of
158 any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this bill of lading
159 be repugnant to said Act to any extent, such term shall be void to that extent, but no further.

160                                New Both-to-Blame Collision Clause
161 ~~If the ship comes into collision with another ship as a result of the negligence of the other ship and any act neglect or default of the~~
162 ~~Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the owners of the goods carried~~
163 ~~hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such loss~~
164 ~~or liability represent loss of or damage to or any claim whatsoever of the owners of said goods, paid or payable by the other or non-~~
165 ~~carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the other or non-carrying ship or her~~
166 ~~owners as part of their claim against the carrying ship or carrier.~~
167 25. ~~The vessel shall not be required to enter any ice-bound port, or any port where lights or light-ships have been or are about to be with-~~
168 ~~drawn by reason of ice, or where there is risk that in the ordinary course of things the vessel will not be able on account of ice to safely enter the~~
169 ~~port or to get out after having completed loading or discharging.~~ See Clause 38.
170 26. Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The owners to remain responsible for the
171 navigation of the vessel, acts of pilots and tugboats, insurance, crew, and all other matters, same as when trading for their own account.
172 27. A commission of 1.00 2 1/2 per cent is payable by the Vessel and Owners to
173 R.S. Platou (Asia) Pte Ltd
174 on hire earned and paid under this Charter; and also upon any continuation or extension of this Charter. ................................ on the hire earned and paid under this Charter.
175 28. An address commission of 2 1/2 per cent payable to ..........Charterers.........................

Clauses 34, 54, 29 to 99, all inclusive as attached hereto are to be considered an integral part of this Charter Party

Owners:                                                                          Charterers:

SPOT SHIPPING LTD.,                                          KOREA LINE (SINGAPORE) PTE LTD

                                                                          Authorised Signature



This Charter Party is a computer generated copy of the NYPE (Revised 3rd October, 1946) form printed under licence from the Association of Ship Brokers & Agents (U.S.A.) Inc. using software which is the copyright of Strategic Software Limited.

It is a precise copy of the original document which can be modified, amended or added to only by the striking out of original characters, or the insertion of new characters, such characters being clearly highlighted by underlining or use of colour or use of a larger font and marked as having been made by the licensee or end user as appropriate and not by the author.

## ADDITIONAL CLAUSES TO MV SPOT / KOREA LINE
## CHARTER PARTY DATED 11TH MARCH 2008

**Clause 3A**

With reference to Clause 3, it is agreed as follows:

Bunkers on delivery to be about 750/850 metric tons Heavy Fuel Oil and about 100/150 metric tons Marine Gas Oil. Prices to be advised 2 days prior to delivery. Bunkers on delivery prices to be paid at first hire remittance. Bunkers on redelivery to be same quantities as on delivery. Prices same both ends.

IFO 380 CST equivalent to ISO 8217 – 2005.
MGO equivalent to DMA.

Charterers / Owners to have the option to bunker for their own account prior to delivery/ redelivery provided not interfering with Vessel's operation.

**Clause 5A Owners banking channel**

Hire to be remitted by telegraphic tested payment to:

To be advised

Evidence of receipt of such funds by the Owners' bank shall constitute compliance of Charterers' obligations to pay hire in accordance with Clause 5, whether Owners are so notified by the bank or not. Where there is any failure to make "punctual and regular payment" due to oversight, negligence or error or omission of Charterers or their Agents, employees or otherwise for any reason where there is absence of intention to fail to make payment as set out, Charterers shall be granted three banking days grace to rectify the failure. Where so rectified the payment shall stand as "punctual and regular payment".

Hire payment shall be considered punctual when it is received by Owners' bankers on / before the due day.

**Clause 15 A**

With reference to Clause 15 it is agreed as follows:

Referring to line 97, the lack onboard at any time of any necessary documentation attesting to the condition of all equipment and complying with regulations shall be deemed a deficiency with any loss of time occasioned thereby to be treated as off hire and directly related extra expenses thereby incurred, if any, to be for Owners' account. Referring to lines 97 and 99, the time so lost for which hire shall cease (or be suspended) shall also include interalia:

    i.   From the time a Vessel puts back to a port or deviates during a voyage (unless it is caused by those who travel onboard under Charterers' auspices) or is withdrawn from the service of Charterers for drydocking, repairs or other Owners' purposes, until the Vessel is again in the same equidistant position from the destination and voyage resumed therefrom.

   ii.   Losses of time due to delay to the Vessel or interference with Charterers' use of the Vessel by strikes, boycotts or stoppages in any form on account of the Vessel's flag, registry, Ownership, manning or wages pattern or her previous trading.

**Clause 29.**

Vessel to provide electric light as on board to permit night work at all hatches at one and the same time, free of expense to Charterers.

ADDITIONAL CLAUSES TO MV SPOT / KOREA LINE
CHARTER PARTY DATED 11TH MARCH 2008

**Clause 30.**

Charterers have the option of holding a superficial inspection at their risk/expense/ time during day time while vessel is at port without interference with vessel's daily/normal operation. Owners or Master to give every facility and assistance to carry out this inspection.

**Clause 31.**

A joint on/off-hire survey for the purpose of determining vessel's condition/ equipment and bunker quantity on delivery and redelivery to be held at last discharging port prior to delivery and redelivery. The time used in and costs of such surveys to be equally shared between Owners and Charterers.

**Clause 32.**

Vessel is a self-trimming bulk carrier and is able to carry a full cargo of heavy grain and/or its products in bulk in vessel's holds as per vessel's specifications.

During the currency of Charter Party period vessel to have on board valid grain tables as per latest SOLAS Grain Loading requirements.

Vessel is able to load a cargo of bulk grain and/or its products with one slack hold without any securing arrangements as per vessel's specifications.

In certain conditions, two slack holds may be permitted subject to stability particulars for grain cargoes and satisfaction of grain/port authorities. Should two slack holds be required, any securing/ stowing and/or mechanical/ manual/ loading/ trimming, spout trimming required as determined by grain/ port authorities to be arranged by Charterers/ their agents at Charterers' time/ risk/ expense and to be done to the satisfaction of said authorities.

For the carriage of grain in bulk vessel to have on board at any time of this Charter Party period valid documents and certificates acceptable to a recognized classification society and all times accepted to National Grain Board.

**Clause 33. – Grain Clean Clause**

Only applicable for first cargo under this Charter Party.

Vessel on arrival at first cargo load port under this Charter Party with all holds clean and ready in all respects, ready to the satisfaction of the Port Warden and/or Grain Surveyor and/or such other recognized local authority or official as local regulations or Shippers may require to receive grain and/or other cargo which the vessel may be required to load.

If on presentation for loading first loading port the vessel should fail to pass the above cargo survey, then vessel to go off-hire until it is in all respects ready to load and survey passed, if some holds are not accepted Charterers shall have the option of accepting the vessel with those which are accepted and in that case Charterers shall pay hire proportionate to the number of holds which have passed survey.

However, if thereafter there should be any delay owing to non-acceptance of any hold, vessel shall be wholly off-hire until the loading program can be resumed.



# ADDITIONAL CLAUSES TO MV SPOT / KOREA LINE
## CHARTER PARTY DATED 11TH MARCH 2008

**Clause 34. – Trading Areas**

Trading Country Exclusions:

Worldwide trading within Institute Warranty Limits. The vessel not to force ice, not to trade in icebound waters, not to follow ice breakers, not to enter or transit areas where there is risk of icebergs and growlers.

The vessel shall be employed always via safe berths, ports, anchorages and safe ice free berths, ports, anchorages, always safely afloat and accessible, except not always afloat but safely aground two times per annum basis River Plate as per NYPE Clause 6 excluding following:

I) Countries excluded by Owners throughout the Charter Party period:

     1) Alaska (but Kenai only allowed during summer season)
     2) Angola (including Cabinda)
     3) Arab league boycotted countries
     4) Bangladesh (allowed as per below paragraph)
     5) Cambodia
     6) CIS Pacific ports
     7) Congo, Democratic Republic of (formerly Zaire)
     8) Cuba
     9) Cyprus (Greek side)
     10)    Eritrea
     11)    Greenland
     12)    Haiti
     13)    Iraq
     14)    Israel
     15)    Liberia
     16)    North Korea
     17)    Somalia
     18)    Sierra Leone
     19)    Yemen/ People's Republic of Yemen (North & South), including Strait of Bab El Mandab
     20)    All countries, zones, areas where United Nations imposes trade sanctions banned by United Nations from time to time.

II) Countries/areas which are excluded by Owners' Underwriters during Charter Party period. Any additional war risk premium charged by vessel's Hull and Machinery Underwriters to be for Charterers' account. However such amount not to exceed what would have been charged by Lloyd's of London.

III) Prohibition of Direct Trade
Charterers not to trade vessel directly with People's Republic of China and Taiwan without clearance which all costs to be Charterers' account.

It's agreed that BIMCO Conwartime 2004 Clause to apply.

Charterers are allowed to call Yemen/ Bangladesh on condition that the Charterers will be solely responsible for any cargo shortage and/or damage and/or claim of whatsoever nature, that may arise during or after discharging, keeping Owners completely harmless to this respect calling Yemen/ Bangladesh.

## ADDITIONAL CLAUSES TO MV SPOT / KOREA LINE
## CHARTER PARTY DATED 11TH MARCH 2008

**Clause 35. – Cargo Exclusions**

Trading with lawful non-dangerous cargoes as per IMO regulations, excluding:

1. Acids
2. Aluminium ferrosilicon powder Briquettes
3. Aluminium nitrate
4. Aluminium silicon powder
5. Aluminium smelting/remelting by-products
6. Ammonium nitrate
7. Ammonium sulphate
8. Ammunition
9. Arms
10. Asphalt
11. Asbestos
12. Barium nitrate
13. Black powder
14. Blasting caps
15. Bonemeal
16. Brown coal
17. Cakes
18. Calcium carbide pitch
19. Calcium nitrate
20. Calcium hydrochloride
21. Calcium hypochlorite & its products
22. Castor beans
23. Cement
24. Clinker
25. Cement Clinker
26. Charcoal
27. Charcopyrite
28. Chilean nitrate, saltpetre
29. Clay
30. Concentrates
31. Copra and copra products
32. Cotton
33. Creosoted good
34. Direct reduced iron/fines/ pellets
35. Expellers
36. Explosives
37. Esparto grass
38. Ferro silicon
39. Ferrophosporus (including briquettes)
40. Fish meal
41. Galena (lead sulphide)
42. Hides
43. Hot bricketted iron (H.B.I.)
44. Ilmenite (dry and moist)
45. Indian coal / coke(allowed provided within IWL)
46. Lead nitrate
47. Lime
48. Livestock of any description
49. Magnesia (unsaked)
50. Magnesium nitrate
51. Naptha
52. Nuclear fuel/ its waste and radio active materials
53. Oil cake
54. Oily seeds
55. Peat moss
56. Pebbles
57. Pellets (iron ore pellets IMDG BC Code App B)
58. Petroleum and/or its products (including petcoke)
59. Pitch prill / prilled coal
60. Plywood
61. Pond coal
62. Potassium nitrate, mixture Chilean
63. Natural potassium nitrate
64. Pyrites
65. Rice in bulk/ gags
66. Rutile, synthetic and natural
67. Salt
68. Scrap
69. Seed cake
70. Silico manganese
71. Sodium nitrate
72. Sodium sulphide
73. Sponge iron
74. Sulphur
75. Tar and its products
76. Titanium
77. TNT bombs
78. Dynamite
79. Turnings
80. Motor blocks,
81. Shavings and oily parts
82. Turpentine
83. Waste
84. War materials / equipments
85. Woodpulp
86. Wooden logs
87. Zinc ashes/ dross/ residues/ skimmings/ sulphide
88. Nickel ore and iron ore from Indonesia and Philippines

All cargo to be loaded/ stowed/ discharged in accordance with IMO regulations. Californian block stowage not allowed. Deck cargo not allowed.



ADDITIONAL CLAUSES TO MV SPOT / KOREA LINE     1ST ORIGINAL
CHARTER PARTY DATED 11TH MARCH 2008

Owners to allow six dirty cargoes per annum out of following:

Unlimited petcoke / scrap (only shredded + HMS 1 and 2 always excluding MBT) / concentrates (zinc, lead, copper only)

Maximum one rock salt per annum – no limewashing.

Owners to allow one consecutive dirty voyage per annum and not to be last cargo.

**Petcoke:**

Only non hazardous / non-dangerous / non- oily / calcined / green delayed type. For petcoke Charterers will provide and pay for the required chemicals for cleaning the holds.

**Scrap:**

Shredded + HMS 1 and 2 allowed.  Charterers undertake that loading of first layers of shredded not to be released until very close to tank top and not to be dumped / dropped during loading. Sufficient quantity of shredded cargo to be loaded at each hold as a layer to protect tanktops against any damage.

**Concentrates (zinc, lead, copper only)**

It is understood and agreed that only copper and zinc and lead concentrates to be allowed. Always excluding metal sulphide concentrates, provided following clause to apply:

1 )        Charterers hereby warrant that the cargo is non-corrosive and harmless subject to the IMO regulations and allowed by the cargo exclusion of governing Charter Party.
2 )        Concentrates cargo shall always be loaded, stowed, carried and discharged in accordance with appropriate local and national regulations and in full compliance with IMO regulations.
3 )        An appropriate certificate shall be furnished to Master, indicating the pre-shipment moisture contents, flow moisture point, actual transportable moisture limit, stowage factor, and angle of repose etc (as defined by IMO) on shipment.
4 )        After loading, cargo must be properly trimmed at Charterers' time and expenses to the surveyor and Master's satisfaction.

Ilmenite sand is allowed provided an appropriate certificate shall be furnished to Master, indicating that cargo is Appendix C and the pre-shipment moisture contents, flow moisture point, actual transportable moisture limit, stowage factor and angle of repose, etc (as defined by IMO) before shipment. This cargo is not classed as a dirty / protective cargo.

**SPOT SHIPPING LTD.**

KOREA LINE (SINGAPORE) PTE LTD

Authorised Signature

**ADDITIONAL CLAUSES TO MV SPOT / KOREA LINE
CHARTER PARTY DATED 11ᵀᴴ MARCH 2008**

**Clause 36.**

Throughout the period of the Charter, vessel shall have on board current valid Panama and Suez Canal Tonnage Certificates and will so comply with all applicable requirements, regulations and recommendations so as to avoid delay in transit of these canals.

Any delay due to non-compliance or any lack of proper documentation (or equipment) is to be treated as off-hire and any expenses incurred thereby to be for Owners' account.  Owners shall keep on board vessel all certificates necessary to comply with regulations of the ports of call, the following certificates at all times during Charter period and shall maintain their validity throughout the Charter period.:

| | |
|---|---|
| a) | All Class Certificates. |
| b) | Deratisation or Deratting Exemption Certificate. |
| c) | Panama and Suez Canal Tonnage Certificate. |
| d) | All statutory Certificates, Tonnage Certificate. |
| e) | Stability particulars for grain cargoes and hold filled with ends untrimmed addendum thereto. |
| f) | FMC (Water Pollution) Certificate. |

**Clause 37.**

It is understood that vessel has full bunkering privileges at U.S. ports.

**Clause 38. – Excluded Ports and Ice Clause**

The vessel not to be ordered to nor bound to enter:

a)  Any place where fever or epidemics are prevalent or to which the Master, Officers and crew by law are not bound to follow the vessel.

b)  Any ice bound port or place or any port or place where lights, lightships, marks and buoys are or are likely to be withdrawn by reason of ice on the vessel's arrival or where there is risk that the vessel will not be able, on account of ice, to reach the port or place or to depart therefrom after completing loading or discharging.  If on account of ice the Master considers it dangerous to remain at the loading or discharging port or place for fear of the vessel being frozen in and/or damaged, the Master shall have the liberty to sail to a convenient open port or place and await the Charterers' fresh instructions.

The Vessel shall not be obliged to force ice, nor to follow icebreakers.  Any time lost through any of the foregoing causes or on account of the vessel being frozen in shall be for the Charterers' account.

Vessel always to trade within Institute Warranty Limits.

**Clause 39.**

Bills of Lading in proper form customarily adopted for the cargo concerned to be signed by Master, but, if time does not permit or Charterers request to do so, Charterers or their Agents may sign Bills of Lading on Master's behalf in conformity with Mate's receipt. All Bills of Lading shall be without prejudice to this Charter and shall contain the following clauses:

General Clause Paramount or Canadian Clause Paramount where applicable, New Jason Clause, New Both-to-Blame Collision Clause, War Risk Clauses as per Clause 58.



**ADDITIONAL CLAUSES TO MV SPOT / KOREA LINE**
**CHARTER PARTY DATED 11TH MARCH 2008**

Charterers shall indemnify Owners against all claims which may be made against Owners/Master and/or Owners' Agents/servants due to Bills of Lading being signed by Charterers or their agents and not being in conformity with Mate's receipts and for all consequences or liabilities which may arise from Charterers or their agents giving incorrect information in any other documents signed by Charterers or Charterers' agents on Owners'/Master's behalf.

**Clause 40. Intermediate Holds Cleaning**

Upon completion of discharge of each cargo, if required by Charterers, Vessel's crew shall render, provided local labour regulations permit and weather permitting, assistance in cleaning the holds against Charterers paying Owners a net lumpsum of USD500 hold for sweeping and washing. Such cleaning work shall be performed while vessel is enroute to next loading port, provided that this can be safely done and that the duration of the voyage is sufficient. Crew will endeavour to effect such cleaning as best as possible but without guarantee that the cargo holds will be sufficiently cleaned and accepted on arrival at loading port and Owners shall not be responsible for any consequences arising from the fact that Vessel's crew has been employed in cleaning.

All fuel, chemical, freshwater and consumable material used to be for Charterers' account. Charterers to supply Vessel with high pressure hoses and chemical spray facility to enable crew to perform the cleaning efficiently. Charterers to provide chemicals at Charterers' expense.

Throughout the currency of this Charter Party and at redelivery, the Charterers shall remain responsible for all cost and time, including deviation, if any, associated with the removal and disposal of cargo related residues and/or dunnages and/or hold washing water and/or chemicals and detergents and/or waste as defined by Marpol Annex V, Section 1 or other applicable rules relating to the disposal of such substances.

**Clause 41.**

Should the vessel be arrested during the currency of this Charter Party at the suit of any person having a legitimate claim against the vessel, hire under this Charter Party shall not be payable in respect of any period during which the vessel is not fully at Charterers' disposal and any directly related expenses shall be for Owners' account, unless such arrest is due to the default of Charterers or their agents.

**Clause 42.**

Master is to forward promptly to Charterers completed log abstracts and port logs on the Charterers' forms for both deck and engine for each passage.

**Clause 43. Drydock Clause**

Owners have the option to drydock the vessel and clean underwater parts.

Payment of hire to be suspended until the vessel is again in the same or equivalent position and all extra expenses including the fuel/MDO consumption to be for Owners' account. Owners to notify Charterers of their intention to drydock at least four months in advance, except in case of emergency and time of drydock to be mutually agreed taking into account Charterers' program and schedule for the vessel, but not to be unreasonably withheld.

Charterers to endeavour to schedule the vessel to the Far East once in the first 18/20 months to undergo guaranteed drydock.

## ADDITIONAL CLAUSES TO MV SPOT / KOREA LINE
## CHARTER PARTY DATED 11TH MARCH 2008

**Clause 44.**

Liability for cargo claims as between Owners and Charterers shall be apportioned in the manner as specified by the Inter-Club New York Produce Exchange Agreement as amended May 1984.

**Clause 45. Hull / Bottom Cleaning Clause**

If the Vessel is in a port or idle at a safe place for more than 20 days, Master will report vessel's hull fouled condition to Charterers. Owners are not responsible for reduction in speed and/or bunkers over consumption if such underperformance is made as a result of hull / bottom growing fouled. However, if requested by Charterers, Owners will endeavor to carry out hull / bottom cleaning at a convenient port mutually agreed where the facilities are available at Charterers' time and expenses. Charterers have no right to lodge a speed or bunker claim against the Owners during the period of the Vessel is in fouled condition even if hull / bottom cleaning done up until such time as Vessel's next scheduled dry-dock.

**Clause 46.**

Master to immediately advise Charterers by telex and stevedores by written notice of any damage done to the Vessel also to notify parties doing the damage and endeavor to obtain their admission of liability. Such notice of damage(s) to be given upon occurrence or as soon as possible thereafter but in any case prior to sailing otherwise Charterers not to be responsible. Undetectable damages should be reported as soon as possible when found.

Copies of correspondence together with the additional letter acknowledging liability, if obtained, to be sent to Charterers as early as possible, provided such damage is readily discernible. Stevedores, although appointed by Charterers, Shippers, Receivers or agents, to be under the direction and control of the Master. Claims for damages to the vessel occurring during loading and discharging or at any time during the voyage due to improper or negligent stowage of the cargo to be settled directly between Owners and stevedores. If settlement of damages cannot be finalized with stevedores within a reasonable time, then Owners can apply to Charterers/ Shippers/ Receivers who will be responsible for settlement. Such damage to be repaired at Stevedores'/ Charterers' time and expense as/when required by Classification Society or if affecting Vessel's seaworthiness, class, trade and full working capacity. In case these damages together with those other damages which may be deferred, if so requested by Charterers, will be repaired at next dry docking in Owners' time, but at Stevedores/Charterers' expense, provided this does not interfere with Owners' repair work or otherwise in Stevedores' or Charterers'/ Shippers'/ Receivers' time as provided above. Owners to provide Charterers with all assistance to enable them to recover damages from stevedores.

**Clause 47.**

Charterers to have the benefit of any return insurance premium receivable by Owners from their Underwriters, by reason of the vessel being in port for minimum 30 consecutive days, provided vessel is on-hire during such period.

**Clause 48.**

Charterers to have the benefit of Owners' P&I Club cover so far as Club rules permit.

**Clause 49. – Financial Responsibility in Respect of Pollution**

1)     Owners warrant that through the currency of this Charter Party they will provide the vessel with the following certificates:

a) Certificates issued pursuant to the Civil Liability Convention 1969 (C.L.C.) (if applicable)



## ADDITIONAL CLAUSES TO MV SPOT / KOREA LINE
## CHARTER PARTY DATED 11TH MARCH 2008

b) Certificates issued pursuant to Section 311 (P) of the U.S. Federal Water Pollution Control Act as amended (Title 33 U.S. Code Section 1321 (P))

2) Notwithstanding anything whether printed or typed herein to the contrary:

a) Save as required for compliance with paragraph 1 hereof, Owners shall not be required to establish or maintain financial security or responsibility in respect of oil or other pollution damage to enable the vessel lawfully to enter, remain in or leave any port, place, territorial or contiguous waters of any country, state or territory in performance of this charter.

b) Save as required for compliance with paragraph 1 Charterers shall indemnify Owners and hold them harmless in respect of any loss, damage, liability or expense arising which Owners may sustain by reason of the vessel's inability to perform as aforesaid.

Vessel to have Certificate of Financial Responsibility under the U.S. Oil Pollution Act 1990 for calling U.S. ports throughout this time charter period.

**Clause 50.**

Charterers have the option to redeliver the vessel with unclean holds against paying lumpsum USD4,000 in lieu of such cleaning, such amount to be paid to Owners on Vessel's redelivery.

**Clause 51.**

Should the vessel be on her voyage to the port of redelivery at the time when payment of hire is due, said payment shall be made for such length of time as Owners or their agents and Charterers and their agents may agree upon as the estimated time necessary to complete the voyage, taking into account bunkers to be taken over by the vessel and reasonably estimated disbursements for Owners' account before redelivery and when vessel is redelivered, any difference shall be refunded by Owners or paid by Charterers as the case may be.

Charterers have the right to deduct only from last hire payments sufficient funds for estimated bunkers on redelivery and estimated Owners' disbursements.

**Clause 52.**

Both delivery and redelivery time to be based on G.M.T. Actual time on hire to be computed on GMT basis.

**Clause 53.**

New Both-to-Blame Collision Clause and New Jason Clause as attached hereto are to be considered part of this Charter Party.

**Clause 54.**

The vessel shall be off-hire for any time lost on account of vessel's non-compliance with governmental and/or state and/or provincial regulations pertaining to water pollution. Owners warrant that during currency of this Charter, Owners will comply with the provisions of U.S. Federal Water Pollution Control Act 1970 as amended by the Clean Water Act 1977 and rules and/or regulations issued thereunder. Should any delay to vessel occur from Owners' failure to comply with any of the provisions of the said acts, rules and/or regulations or amendments thereto the vessel to be considered off-hire for the time thereby lost. Owners indemnify Charterers against all claims, liabilities and costs which may arise, including but not limited to claims by Charterers against Owners by reason of any non-compliance as aforesaid.

Vessel shall have FMC (Water Pollution) Certificate before entering U.S. ports.



## ADDITIONAL CLAUSES TO MV SPOT / KOREA LINE
## CHARTER PARTY DATED 11TH MARCH 2008

**Clause 55.**

Wherever the word "fuel" appears in this time charter party same is understood to mean "bunkers" unless otherwise specified.

**Clause 56. – Vessel's Full Description**

**[All Details About & WOG ]**

Notwithstanding the anything contained in this rough description, it's clearly understood and agreed by the charterers that vessel is a newbuilding and owners shall have right to revise all figures including speed & consumptions, along with the newbuilding contract, shop tests, sea trails results and during vessels 3 months performance after delivery from shipyard when vessel is placed at charterer's disposal

Type of Vessel:
The vessel to be designed as an ocean going single screw diesel driven self-trimming bulk carrier, suitable for normal worldwide service carrying dry bulk cargo. For loading in alternate holds No. 2 & 4 may be kept empty. CO2 fixed extinguishing for all cargo holds. Natural ventilation for holds.

| | |
|---|---|
| Built Year / Place : | Sch. November.2008 / Zhejiang Shipbuilding Co. Ltd. |
| Ex-name : | N/A, NEWBUILDING |
| Flag : | MALTA |
| Port of Registry / No : | VALETTA, MALTA / TBN |
| Class : | BV +HULL, +MACH, Bulk Carrier BC-A(Holds No.2, 4 may be empty) ESP, unrestricted navigation, +AUT- UMS, Veri-STAR-HULL, INWATERSURVEY, MONSHAFT |
| Class ID No : | TBN |
| IMO No : | [ Hull # : ZJB07-172 ] -IMO No: tbn |
| Dwt : | 53208,2 Summer Salt Water Draft 12,49 M Revise after Incl. Expt. |
| | 54676,5 Tropical Salt Water Draft 12,75 M " |
| | 51744,8 Winter Salt Water Draft 12,23 M " |
| | 43235,2 Design Draft 10,70 M |
| Light Ship : | abt. 10,500 MT TBC after inclining test " |
| Registered Grt / Nrt : | abt. 30,891 MT / 18,160 MT |
| Suez Canal Grt / Nrt : | TBN |
| Panama Canal Grt / Nrt : | TBN |
| LOA/Beam : | abt. 189.99 M / 32.26 M |
| LBP / Depth Moulded : | abt. 182.00 M / 17.20 M |
| Ho/Ha : | 5 Holds / 5 Hatches |
| FW tanks : | abt. 280 CBM [ No Minimum fresh water quantity can be guaranteed ] |
| Drinking water : | abt. 45 CBM [ No Minimum fresh water quantity can be guaranteed ] |
| Feed Water Tank : | abt. 45 CBM [ No Minimum fresh water quantity can be guaranteed ] |
| Crew, stores and provision : | abt. 55 MT |
| TP 1cm : | abt. 56,4 MT |
| Constant : | abt. 250 MT [ Excluding Fresh Water ] |
| Hatch coaming height at ship's center line : | 1.9M at No. 2-5 2.3M at No.1 |
| Distance from ship's rail to edge of hatch covers/coaming : | (m) No. 1 No. 2 - 5 |
| Fore : | 4,8 6,75 |
| Aft : | 6,75 6,75 |



ADDITIONAL CLAUSES TO MV SPOT / KOREA LINE
CHARTER PARTY DATED 11TH MARCH 2008

Holdwise Cargo Capacity [ Grain ] [ Bale ]
CBM CBF CBM CBF
Hold # 1 : 11.131,54 393.110,33 10.974,91 387.578,94
Hold # 2 : 14.112,90 498.397,06 13.767,82 486.210,56
Hold # 3 : 13.375,74 472.364,26 13.062,44 461.300,07
Hold # 4 : 14.090,45 497.604,24 13.740,88 485.259,18
Hold # 5 : 12.338,73 435.742,25 12.107,98 427.593,31
Total Hold Capacity abt. 65.049,36 2.297.218,14 63.654,03 2.247.942,06

Max Hold Dimensions By LXBXH Length Breadth at hold ends Height [Including Hatch Coaming ]

Extent of Hold Below TS wing tank TT to Coaming Top
Hold # 1 : 27.88 M x 12.16 & 29.86 M x 18.82 M
Hold # 2 : 31.16 M x 29.86 M x 17.55 M
Hold # 3 : 29.52 M x 29.86 M x 17.55 M
Hold # 4 : 31.16 M x 29.86 M x 17.55 M
Hold # 5 : 29.52 M x 29.86 & 25.98 M x 17.55 M

Flat Tanktop Dimensions

Extent of Tank Top (excl bottom stool) Length- M Breadth [ Fore / Aft ] - M
Hold # 1 : 27,88 x 7.0 M / 23.0 M
Hold # 2 : 28,70 x 23.50 M
Hold # 3 : 27,06 x 23.50 M
Hold # 4 : 28,70 x 23.50 M
Hold # 5 : 27,06 x 23.50 M / 13.80 M

Hatch Cover Type :        Hydraulic,folding HC double skin construction

Hatch Opening Dimensions [ Length x Breadth ]
Hatch # 1 :            18.86 x 18.26 M
Hatch # 2, 3, 4, 5 :     21.32 x 18.26 M

Air Draft
From B/L to Top of Mast :          47.05 M
Scantling draft to Top of Mast :     34.56 M
B/L to Top of Hatch Coaming :      20.60 M ( No.1 ) / 19.50 M ( No.2 - No.5 )
From B/L to Top of Hatch Cover:    21.50 M ( No.1 ) / 20.40 M ( No.2 - No.5 )
Load WL to hatch cover top :       9.01 M ( No.1 ) / 7.91 M ( No.2 - No.5 )

Ropes :
10 Ropes on board. Charterers provide and pay for additional ropes if required.

Maximum Allowable Load Strength of Tanktop :      Holds # 1,3,5 24 t/m2
                                                   Holds # 2&4 20 t/m2
Deck :                                             No Deck Cargo can be loaded on deck / hacthcovers
Gears :                                            4 x 35 Tons SWL at abt. 28 / 5 M radius
                                                   Electro-Hydraulically Driven
SWL Grab operation :   During grabs operations max SWL is 28 MT
Locations of Gears   Gear # 1 : Between Hatches 1 / 2
                     Gear # 2 : Between Hatches 2 / 3
                     Gear # 3 : Between Hatches 3 / 4
                     Gear # 4 : Between Hatches 4 / 5



## ADDITIONAL CLAUSES TO MV SPOT / KOREA LINE
### CHARTER PARTY DATED 11TH MARCH 2008

Charterers to employ competent shore hands to operate vessel's crane / grabs at Charterer's cost and risk. No crane man from vessel's crew.

Grabs :
Peiner Motor Dual Scoop Grabs, Type MZGL 13000-6-B
4 grabs each 13 cbm / lightweight each 9250 kg
Grabs can handle cargoes stowing 0,33 cbm / mt or lighter
Grabs can be adjustable to 11 / 9 / 7,5 / 6 cbm

Main Engine :  MAN B&W 6S50MC-C, 9480 KW / 127 RPM -SFOC- 171(+5%) gm/kw/hr ISO 3046-1
DG sets :       Daihatsu/China -720 Kw
Boiler :         AALBORG Composite Boiler MISSION-TM-OC -1500kg/h oil-fired / 1000kg/h exh. Gas
HFO :           ME & DE can burn 380 CST HFO at 50C
Evaporator Capacity : 25,00 MT / Day

Tank Capacity for Bunkers IFO / MGO [100%] :    abt. 2092 CBM / abt. 151 CBM
Fuel Consumptions : to be revised / advised along with the shop tests and sea trial results and during Vessel's three months performance after delivery

Main Engine
Laden: Abt 14.00 Kn ME 7769 Kw at 118.8 RPM : Abt 33.5 MT HFO [ 380 CST ] TBR
Ballast: Abt 14.50 Kn : Abt 33.5 MT HFO [ 380 CST ] TBR

Diesel Generators : Abt 2.5 MT HFO [ 380 CST ] TBR

Port Consumptions :
Idle : Abt 1.5 MT MGO TBR
Gear Working : Abt 3.5 / 4.5 MT MGO TBR

Boilers : Abt 0.8 MT MGO TBR

FUEL CONSUMPTIONS

At Full Summer SW Draft [ abt. 12.49 M ]
All Speed and Consumption Figures are to be considered as "About" [ "About" Means+/- 0.5 Knot for and "Speed" + / - 5 % for "Bunker Consumptions" ] .Vessel' Speed always subject to "Good Weather" and "Smooth Sea Basis No Adverse Currents / Swells" and Upto Maximum "Beaufort Force 4" and Maximum "Douglas Seastate 3"

Diesel Generators / Boilers will also burn MGO/DMA during the Starting and Stopping Operation for an hour or enough time to flush the Fuel Oil System. Also If the load of Main Engines drops less than 60% of MCR, fuel has to be shifted to Diesel Oil instead of Heavy Fuel Oil.

Vessel has liberty to Consume MGO/DMA When Manuevering in Shallow / Narrow / Busy and Restricted Waters, Canals, Rivers, in / out Ports, during bad weather, if required .

Bunker Specs :                          As per specified in the 5th & 6th pages of Vessel's Description.
Owners P&I Club :                       TBN
Insured Hull & Machinery Value :        TBN
Last Dry Dock :                         N/A, Newbuilding
Last Special Survey :                   N/A, Newbuilding



## ADDITIONAL CLAUSES TO MV SPOT / KOREA LINE
## CHARTER PARTY DATED 11TH MARCH 2008

| | |
|---|---|
| Crew Nationality : | TBN |
| Name of the Master : | TBN |

COMMUNICATION

| | |
|---|---|
| Call Sign : | TBN |
| Inmarsat - C [ Telephone ] : | TBN |
| Inmarsat - C [ Fax ] : | TBN |
| Inmarsat - F [ Telex ] : | TBN |
| Inmarsat - F [ E-Mail ] : | TBN |

DETAILS OF OWNERS

| | |
|---|---|
| Name of Managers : | GENEL DENIZCILIK NAKTBN LIYATI A.S. [ GEDEN LINE ] |
| Name of Registered Owners : | SPOT SHIPPING LTD., VALETTA, MALTA |
| Address : | YAPI KREDI PLAZA A-BLOK KAT 12 |
| | 34330, LEVENT ISTANBUL / TURKEY |
| Telephone : | +90 [212] 319 51 00 |
| Fax : | +90 [212] 283 1604 / 05 |
| E-mail : | chartering@gedenlines.com |
| | www.gedenlines.com |
| | gedenlines@gedenlines.com |

I. BUNKER SPECS

1). All bunker fuels to be supplied to be within ISO 8217 -2005 [ DMA for Gas Oils / RMG 380 for HFO]
2). The net calorific value of fuels delivered for main propulsion plant consumption is to have a minimum value of 40.0 MJ/Kg. Claims arising from under performance of vessel where fuel supplied has a lower level of energy than 40.0 MJ/Kg, are to be adjusted accordingly to the reduction in net calorific value from 40.0 MJ/Kg.
3). All fuels supplied to the vessel shall be derived from standard refinery processes of petroleum crude oils and are not to include waste materials such as spent lubricating oils and/or chemical waste.
4). Silicon + Aluminium contents will not exceed 30 mg / kg
5). a. Sampling shall be carried out at the ship's receiving manifold by continuous drip method.
b. Sampling device will be checked and sealed by both parties at the beginning of the bunkering.
c. Both parties shall attend to witness breaking the seal at the end of the bunkering.
d. Sufficient volume to be taken for splitting into 5 samples dully signed as follows;.
Sample # 1. To be sent to DNV Laboratories.
Sample # 2. To be given to the Bunker Supplier.
Sample # 3. To be retained on board of the Vessel.
Sample # 4. To be retained on board of the Vessel for MARPOL requirement.
Sample # 5. One sample for the bunker surveyor ( if engaged )
e. Sample bottles to be provided by the vessel.
f. The seal numbers of these samples must be recorded on the bunker delivery note. Sample labels must not be pre-signed and samples not taken during the fuel delivery shall not be accepted.
g. In case of any dispute regarding the result of the sample sent to DNV Laboratory by Owners, then the sample retained on board of the vessel to be sent to a Laboratory for a Joint Bunker Analysis agreed by both Owners and Charterers ( If possible DNV ). In this case sample to govern quality of the bunkers supplied shall be the 3rd sample retained on board of the Vessel. The test result of this 3rd Bunker Sample ( which is kept on board of the vessel ), to be binding for all parties including density which to be used in calculating the actual Bunkers Quantity information. Cost of the All Bunker Analysis for the samples to be shared 50 / 50 pct between Owners and Charterers. Unless Charterers fail to provide proper bunkers along with the Charter Party Specs. Bunker Supplier and the Charterers can arrange a survey for 2nd Sample kept by the Bunker Supplier but this shall not be binding for any party.



**ADDITIONAL CLAUSES TO MV SPOT / KOREA LINE
CHARTER PARTY DATED 11TH MARCH 2008**

6). Sodium to Vanadium ratio to be less than 1 : 3
7). Density at 15 degrees C to be max 0.991
Marine gas oil/distillate fuel must not have a sulphur content of more than 0.20% m/m in accordance with EU Council Directive, 1999, 32/EC when the Vessel is entering EU member territorial waters.

## II. MARPOL ANNEX VI

Below described definitions shall be applied by Charterers for fuel oil supply of No 1 port and starboard fuel oil tanks which are dedicated for low sulphur fuel oil tanks as provision of Marpol Annex VI.
Charterers hereby also guarantee to comply with all rules & regulations in relation with Marpol Annex VI.
1). The fuel shall not contain inorganic acid.
2). The fuel shall not include any added substances or chemical waste which either jeopardizes safety of ship or the performance of the engine, is harmful to personnel, or contributes to additional air pollution. This shall not preclude incorporation of small amounts of additives intended to improve some aspects of performance.
3). The bunker delivery note shall be accompanied by a sample of the fuel delivered, sealed and signed by the supplier's representative and master or officer in charge of the bunker operation. The sample shall be retained under the ship's control until the fuel is consumed but not for less than twelve months after the time of delivery.
4). The sampling equipment and test procedures shall comply with the DNVPS Guidelines: "Marine Fuel Management" based on the standards referred to in Table B1, Sec.1 B408.
5) SOx emission limits are generally achieved by use of low sulfur content fuel oil. When in port or SOx controlled areas, the maximum sulfur content in fuel oil used is 1.5 % S. Changes of fuel type when entering and leaving port, or SOx controlled areas shall be documented by entries in the ship's logbook.
6). The emission criteria specified for oil fired boilers.
7). SOx emission controlled areas shall include:
a. The Baltic Sea areas as defined in Marpol 73/78/97 regulation 10(1)b of Annex I; and
b. Vessels when they are within 24 nautical miles of the Californian Coast line ( from the California-Oregon border to the California-Mexico border )
c. Any other area, including port areas, designated by the Organization in accordance with criteria and procedures for designation of SOx emission controlled areas with respect to the prevention of air pollution from ships contained in appendix III to this Annex (Marpol 73/78/97 Annex VI)

## III. OTHERS

If there will be any further alterations/amendments other than above, Charterers shall immediately take necessary steps without any notice from Owners. The Owners shall in no case liable for any time losses / expenses / costs / consequences / speed reductions / over consumptions etc / whatsoever as a result of Charterers failure due to not supply the bunker in accordance with the calling port/place authorities regulations / rules / circulars etc.

**Clause 57.** Deleted

**Clause 58.**

Owners warrant that vessel complies with regulations pertaining to trading to or from the United States port existing at the date of this Charter Party. In the event of non-compliance therewith vessel to be off-hire for the time lost thereby.



## ADDITIONAL CLAUSES TO MV SPOT / KOREA LINE
## CHARTER PARTY DATED 11TH MARCH 2008

**Clause 59.**

Owners warrant that when trading under their Ownership the vessel has not traded to Cuba or North Vietnam since January 1st 1963 nor Israel.

Vessel is not blacklisted by Arab countries nor other countries within the trading limits as stipulated herein.

**Clause 60.**

Vessel to be in all respects suitable for discharge by grab or normal/suitable size and Charterers to have the privilege of using bulldozers of normal/suitable size, weight of bulldozer including cargo not to exceed tank top strength and weight in vessel's holds, subject to Master's approval, which not to be unreasonably withheld.

**Clause 61.**

Charterers shall not be liable for loss of life or personal injury nor arrest or seizure or loss or damage to the vessel and/or other objects arising from perils insured against by Owners' policies of insurance.

**Clause 62.**

Charterers endeavor to keep Owners closely informed of vessel's movements and probable employment, together with full styles of Charterers' agents appointed at each port.

Charterers' agents shall undertake vessel's normal matters on Owners' behalf without charging any additional agency fee, unless there should be some extraordinary matters such as attending to crew desertion/ hospitalization, if any, or survey work for Owners' account, in which case Owners shall pay Agents the agency fee as per the tariff or to appoint Owners' husbandry agents handling same. Any charges raised by Charterers' agents (agency fee excluded) for services rendered to Owners to be for Owners' account.

**Clause 63.**

Any disputes arising under this Charter to be referred to arbitration in London with English law to apply, one arbitrator to be nominated by Owners and the other by Charterers and in case the arbitrators shall not agree, then to the decision of an umpire to be appointed by them, the award of the arbitrators or the umpire to be final and binding upon both parties.

If either of the appointed arbitrators refuses to act or is incapable of acting or dies, the party who appointed him may appoint a new arbitrator in his place.

If one party fails to appoint an arbitrator either originally or by way of substitution as aforesaid for seven clear days after the other party having appointed his arbitrator has served the party making default with notice to make the appointment, the party who has appointed an arbitrator may appoint that arbitrator to act as sole arbitrator in the reference and his award shall be binding on both parties as if he had been appointed by consent.

Arbitrators to be commercial shipping men.

**Clause 64.**

Vessel has liberty of using diesel oil while maneuvering in and/or out of ports, in shallow/ narrow/ busy waters, straits, canals, rivers.



## ADDITIONAL CLAUSES TO MV SPOT / KOREA LINE
## CHARTER PARTY DATED 11TH MARCH 2008

**Clause 65.**

In case Charterers trade vessel to Red Sea, Saudi Arabian port(s), Charterers shall meet all costs, losses and expenses incurred and pay for all time spent in consequence of and/or in compliance with all requirements whatsoever of the Saudi Arabian Port Authority (including the Jeddah Port Administration) provided such costs, losses, expenses and loss of vessel's time are not covered under Vessel's P&I insurance and provided such costs, losses, expenses and loss of time are a direct result of Charterers' failure to comply with relevant Saudi regulations pertaining to Charterers.

**Clause 66.**

Charterers shall pay lumpsum USD1,200 per month or pro-rata in lieu of communications/ victualling/ entertainment. This lumpsum also covers cost of cigarettes, drinks, petty expenses etc., incurred by Master, as well as the cost of radio telegrams, telex and fax communications, and phone calls made by Master on behalf of Charterers or their agents in direct performance of this Charter Party.

**Clause 67.**

Watchmen for cargo to be for Charterers' account and gangway watchmen to be provided by Owners, but where compulsory to employ and pay gangway watchmen from shore, the expense to be for Charterers' account.

All opening and closing of hatches at each port to be done by Vessel's crew as required by Charterers, provided same is permitted by local port authorities/labour union, otherwise Charterers shall employ and pay for shore labour for opening/closing hatches.

**Clause 68.**

Any and all taxes or dues on cargo or freight to be for Charterers' account.
U.S. Tax Reform 1986 Clause to apply namely:

Any U.S. Gross Transportation Tax as enacted by the United States Public Law 99-514 (also referred to as the U.S. Tax Reform Act 1986) including later changes and amendments, levied on income attributable to transportation under this Charter Party which begins or ends in the United States and which income under the laws of the United States is treated as U.S. source transportation gross income shall be reimbursed by the Charterers.

**Clause 69.**

Charterers shall have the option of laying up the vessel for all or any portion (exceeding 30 days) of the charter period, in which case hire hereunder shall continue to be paid, but there shall be credited against such hire the whole amount which Owners shall save (or reasonably should have) during such period of lay-up through reduction in expenses, less any extra expenses to which Owners are put as a result of such lay-up.

**Clause 70.**

Should the vessel be lost or become a constructive total loss, hire shall cease at noon on the day of her loss or constructive total loss and if missing, from noon on date when last heard of and any hire paid in advance and not earned shall be refunded to the Charterers. If vessel is missing at the time when hire become payable, payment shall be suspended until the vessel is reported safe.

## ADDITIONAL CLAUSES TO MV SPOT / KOREA LINE
## CHARTER PARTY DATED 11TH MARCH 2008

**Clause 71.**

In case of smuggling by Master/ vessel's crew, Owners to be responsible for any delay to vessel/ expenses/ fines/ penalties resulting therefrom but Charterers to be responsible for the same if caused by smuggling by Charterers' servants/ agents.

**Clause 72.**

Owners hereby indemnify Charterers or their agents against all claims/ liabilities arising from the employment of pilots or tugboats who, although employed by Charterers shall be deemed to be servants and in the service of Owners and under their instructions, but such indemnity shall not exceed the amount to which Owners would have been entitled to limit their liability if they had themselves employed such pilots or tugboats.

**Clause 73.**

This Charter Party has been drawn up in two originals, one to be retained by Owners and the other by Charterers.

**Clause 74.**

Vessel will be Malta flag.  In the event of loss of time due to boycott of the vessel by shore labour or due to government restrictions or its recommendations all caused by reason of the terms and conditions on which the members of the crew are employed or by reason of any trading of this or any other vessel under same ownership, operation or control, or by the ITF, payment of hire shall cease for the time thereby lost and the Owners to reimburse the Charterers any expenses caused thereby.

**Clause 75. Seaworthy Trim Clause**

Charterers shall leave the Vessel in seaworthy trim and with cargo on board safely stowed to Master's satisfaction between loading berths / ports and between discharging berths / ports, respectively; any expenses resulting therefrom shall be for Charterers' account and any time used shall count.

**Clause 76.**

Owners' option to bunker vessel for their account prior redelivery provided same does not interfere with Charterers' cargo operations.

**Clause 77. – BIMCO U.S. Trade Clause – Unique Bill of Lading Identifier Clause**

The Charterers warrant that each transport document accompanying a shipment of cargo destined to a port or place in the United States of America shall have been endorsed with a Unique Bill of Lading Identifier as required by the U.S. Customs Regulations (19 CFR Part 4 Section 4.7a) including subsequent changes, amendments or modifications thereto, not later than the first port of call.

Non-compliance with the provisions of this Clause shall amount to breach of warranty for the consequences of which the Charterers shall be liable and shall hold the Owners harmless and shall keep them indemnified against all claims whatsoever which may arise and be made against them.

Furthermore, all time lost and all expenses incurred including fines as a result of the Charterers' breach of the provisions of this Clause shall be for the Charterers' account.

## ADDITIONAL CLAUSES TO MV SPOT / KOREA LINE
## CHARTER PARTY DATED 11TH MARCH 2008

**Clause 78. Bunker Fuel Sulphur Content Clause for Time Charter Parties 2005**

(a) Without prejudice to anything else contained in this Charter Party, the Charterers shall supply fuels of such specifications and grades to permit the Vessel, at all times, to comply with the maximum sulphur content requirements of any emission control zone when the Vessel is ordered to trade within that zone.

The Charterers also warrant that any bunker suppliers, bunker craft operators and bunker surveyors used by the Charterers to supply such fuels shall comply with Regulations 14 and 18 of MARPOL Annex VI, including the Guidelines in respect of sampling and the provision of bunker delivery notes.

The Charterers shall indemnify, defend and hold harmless the Owners in respect of any loss, liability, delay, fines, costs or expenses arising or resulting from the Charterers' failure to comply with this Sub-clause (a).

(b) Provided always that the Charterers have fulfilled their obligations in respect of the supply of fuels in accordance with Sub-clause (a), the Owners warrant that:

(i) the Vessel shall comply with Regulations 14 and 18 of MARPOL Annex VI and with the requirements of any emission control zone; and

(ii) the Vessel shall be able to consume fuels of the required sulphur content when ordered by the Charterers to trade within any such zone.

Subject to having supplied the Vessel with fuels in accordance with Sub-clause (a), the Charterers shall not otherwise be liable for any loss, delay, fines, costs or expenses arising or resulting from the Vessel's failure to comply with Regulations 14 and 18 of MARPOL Annex VI.

(c) For the purpose of this Clause, "emission control zone" shall mean zones as stipulated in MARPOL Annex VI and/or zones regulated by regional and/or national authorities such as, but not limited to, the EU and the US Environmental Protection Agency.

**Clause 79.**

If original Bills of Lading are not available prior to discharge of cargo, the Owners to accept Charterers' Letter of Indemnity as per Owners' standard Protection and Indemnity Club format in respect of releasing cargo without original Bills of Lading.

Said indemnity to be signed by an authorized signatory of Charterers.

**Clause 80.**

Owners to be responsible for all costs arising from detention, seizure or forfeiture of the vessel in the event of any contravention of U.S.A. Anti-Drug Abuse Act of 1986 and Vessel to be off-hire for any period during such detention, seizure or forfeiture unless caused by Charterers and/or Charterers' servants and/or Shippers in which case Charterers to be fully responsible for all consequences arising thereof.

## ADDITIONAL CLAUSES TO MV SPOT / KOREA LINE
## CHARTER PARTY DATED 11TH MARCH 2008

**Clause 81.**

The Charterers may supply an independent weather routing company's advice to the Master, during the voyages specified by the Charterers. The Master shall comply with the reporting procedure of the routing service. But it is understood that final routing is always at Master's discretion for safety navigation. Evidence of weather condition to be taken from the vessel's deck logs and independent weather bureau's reports.

No deduction from hire to be made without Owners agreement of Charterers' written evidence of speed deficiency and any financial loss.

**Clause 82.**

Vessel is guaranteed suitable for grab discharge.

**Clause 83.**

Vessel is able to load a full cargo of ore using alternate holds only, holds 2/4 maybe left empty.

**Clause 84.**

Hire payable every 15 days in advance net per day or prorata.

Payment of first hire and value of bunkers on delivery to be paid after Vessel's delivery. Charterers are entitled to deduct from last hire payment estimated Owners' disbursements but maximum USD1,000 per port and value of bunkers on redelivery.

**Clause 85.**

It is expressly agreed that the vessel may be lightened or partly or fully loaded and/or discharged to lightening vessel/craft at any safe anchorage and/or berth as ordered by Charterers or the vessel may be used for lightening other vessels at any such anchorage and/or berth. The operations to be carried out in safety conditions under the Master's supervision/ approval. Such operation to be carried out subject to good weather, smooth and calm sea, light winds and current when Master thinks fit.

**Clause 86. – BIMCO Double Banking Clause**

A) The Charterers shall have the right, where and when it is customary and safe for vessels of similar size and type to do so, to order the vessel to go, lie or remain alongside another vessel or vessels of any size or description whatsoever or to order such vessels to come and remain alongside at such safe dock, wharf, anchorage or other place for transshipment, loading or discharging of cargo and/or bunkering.

B) The Charterers shall pay for and provide such assistance and equipment as may be required to enable any of the operations mentioned in this clause safely to be completed and shall give the Owners such advance notice as they reasonably can of the details of any such operations.

C) Without prejudice to the generality of the Charterers right under (A) and (B), it is expressly agreed that the Master shall have the right to refuse to allow the vessel to perform as provided in (A) and (B) if in his reasonable opinion it is not safe to do so.

D) The Owners shall be entitled to insure any deductible under the vessel's hull policy and the Charterers shall reimburse the owners any additional premium(s) required by the Vessel's Underwriters and/or the cost of insuring any deductible under the vessel's hull policy.

E) The Charterers shall further indemnify the Owners for any costs, damage and liabilities resulting from such operation. The vessel shall remain on hire for any time lost including periods for repairs as a result of such operation.



**ADDITIONAL CLAUSES TO MV SPOT / KOREA LINE
CHARTER PARTY DATED 11TH MARCH 2008**

**Clause 87. Plans**

Owners are to provide Charterers with copies of the vessel's capacity plan, hydrostatic curves, deadweight scale, together with copies of the currently approved grain loading plan and trimming scales, when these documents are available from shipyard.

**Clause 88.**

In the event of a breakdown of a crane(s)/winch(es) or other equipment belonging to the Owners necessary for the loading and unloading of the vessel for any period by reason of disablements or insufficient power, the hire to be reduced pro-rata for the period of such inefficiency in relation to the number of cranes/winches or equipment available and Owners to be liable for stevedore standby charges up to a maximum of the shift on duty at the time of breakdown.

**Clause 89.**

Vessel to comply with and be maintained in accordance with the requirements of the Commonwealth of Australia loading and unloading safety measure regulations.  Vessel to be fitted and will be maintained with hold ladders and crane access ladder for Australian trading.

**Clause 90. BIMCO Standard ISM Clause**

From the date of coming into force of the International Safety Management (ISM) Code in relation to the Vessel and thereafter during the currency of this Charter party, the Owners shall procure that both the Vessel and "the Company" (as defined by the ISM Code) shall comply with the requirements of the ISM Code. Upon request the Owners shall provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) to the Charterers.

Except as otherwise provided in this Charterparty, loss, damage, expense or delay caused by failure on the part of the Owners or "the Company" to comply with the ISM Code shall be for the Owners' account."

**Clause 91.**

Vessel to work night, day, if required by Charterers, and all winches and/or cranes to be at Charterers' disposal during loading and discharging, overtime stipulated herein also to include the following services:

| | |
|---|---|
| a) | Clearing of cranes from stowage in preparation for loading and/or discharging, if the rule of t the port or labour union permits. |
| b) | Opening and closing of hatches in preparation for loading and/or discharging, if the rule of the port or labour union permits. |
| c) | Supervision of loading and/or discharging. |
| d) | Maintaining power while loading and/or discharging, and care of cranes. |
| e) | Shifting ship during loading and/or discharging, and shifting between berths. |
| f) | Docking and undocking. |
| g) | Bunkering. |
| h) | Officers and crew to shape up the ship's hatches and gear as much as possible prior to arrival at loading and/or discharging port, docks and/or places so as to immediately commence loading and/or discharging operations. |

**Clause 92.**

All negotiations and / eventual fixture to remain strictly private and confidential.



**ADDITIONAL CLAUSES TO MV SPOT / KOREA LINE**
**CHARTER PARTY DATED 11TH MARCH 2008**

**Clause 93.**

Vessel shall be entered and will remain entered during the full currency of this Charter with a recognized first class P&I Club and shall carry full P&I cover.

**Clause 94.**

Owners have the option to sell/change ownership of the vessel during the currency of this Charter, subject to Charterers prior approval which not to be unreasonably withheld. It is agreed and understood that possible new buyers shall maintain at least the same standard in terms of class/ P&I and/or other important issues.

**Clause 95. – CONWARTIME 2004**

(a) For the purpose of this Clause, the words:

(i) "Owners" shall include the shipowners, bareboat charterers, disponent owners, managers or other operators who are charged with the management of the Vessel, and the Master; and

(ii) "War Risks" shall include any actual, threatened or reported:
war; act of war; civil war; hostilities; revolution; rebellion; civil commotion; warlike operations; laying of mines; acts of piracy; acts of terrorists; acts of hostility or malicious damage; blockades (whether imposed against all vessels or imposed selectively against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever); by any person, body, terrorist or political group, or the Government of any state whatsoever, which, in the reasonable judgement of the Master and/or the Owners, may be dangerous or are likely to be or to become dangerous to the Vessel, her cargo, crew or other persons on board the Vessel.

(b) The Vessel, unless the written consent of the Owners be first obtained, shall not be ordered to or required to continue to or through, any port, place, area or zone (whether of land or sea), or any waterway or canal, where it appears that the Vessel, her cargo, crew or other persons on board the Vessel, in the reasonable judgement of the Master and/or the Owners, may be, or are likely to be, exposed to War Risks. Should the Vessel be within any such place as aforesaid, which only becomes dangerous, or is likely to be or to become dangerous, after her entry into it, she shall be at liberty to leave it.

(c) The Vessel shall not be required to load contraband cargo, or to pass through any blockade, whether such blockade be imposed on all vessels, or is imposed selectively in any way whatsoever against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever, or to proceed to an area where she shall be subject, or is likely to be subject to a belligerent's right of search and/or confiscation.

(d) (i) The Owners may effect war risks insurance in respect of the Hull and Machinery of the Vessel and their other interests (including, but not limited to, loss of earnings and detention, the crew and their protection and Indemnity Risks), and the premiums and/or calls therefor shall be for their account.

(ii) If the Underwriters of such insurance should require payment of premiums and/or calls because, pursuant to the Charterers' orders, the Vessel is within, or is due to enter and remain within, or pass through any area or areas which are specified by such Underwriters as being subject to additional premiums because of War Risks, then the actual premiums and/or calls paid shall be reimbursed by the Charterers to the Owners at the same time as the next payment of hire is due, or upon redelivery, whichever occurs first.

(e) If the Owners become liable under the terms of employment to pay to the crew any bonus or additional wages in respect of sailing into an area which is dangerous in the manner defined by the said terms, then the actual bonus or additional wages paid shall be reimbursed to the Owners by the Charterers at the same time as the next payment of hire is due, or upon redelivery, whichever occurs first.



## ADDITIONAL CLAUSES TO MV SPOT / KOREA LINE
## CHARTER PARTY DATED 11TH MARCH 2008

(f) The Vessel shall have liberty:-

(i) to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery, or in any other way whatsoever, which are given by the Government of the Nation under whose flag the Vessel sails, or other Government to whose laws the Owners are subject, or any other Government, body or group whatsoever acting with the power to compel compliance with their orders or directions;

(ii) to comply with the order, directions or recommendations of any war risks underwriters who have the authority to give the same under the terms of the war risks insurance;

(iii) to comply with the terms of any resolution of the Security Council of the United Nations, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;

(iv) to discharge at any other port any cargo or part thereof which may render the Vessel liable to confiscation as a contraband carrier;

(v) to call at any other port to change the crew or any part thereof or other persons on board the Vessel when there is reason to believe that they may be subject to internment, imprisonment or other sanctions.

(g) If in accordance with their rights under the foregoing provisions of this Clause, the Owners shall refuse to proceed to the loading or discharging ports, or any one or more of them, they shall immediately inform the Charterers. No cargo shall be discharged at any alternative port without first giving the Charterers notice of the Owners' intention to do so and requesting them to nominate a safe port for such discharge. Failing such nomination by the Charterers within 48 hours of the receipt of such notice and request, the Owners may discharge the cargo at any safe port of their own choice.

(h) If in compliance with any of the provisions of sub-clauses (b) to (g) of this Clause anything is done or not done, such shall not be deemed a deviation, but shall be considered as due fulfilment of this Charter Party.

### Clause 96. – BIMCO ISPS/MTSA Clause for Time Charter Parties 2005

(a)(i) The Owners shall comply with the requirements of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) relating to the Vessel and "the Company" (as defined by the ISPS Code). If trading to or from the United States or passing through United States waters, the Owners shall also comply with the requirements of the US Maritime Transportation Security Act 2002 (MTSA) relating to the Vessel and the "Owner" (as defined by the MTSA).

(ii) Upon request the Owners shall provide the Charterers with a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) and the full style contact details of the Company Security Officer (CSO).

(iii) Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Owners or "the Company"/"Owner" to comply with the requirements of the ISPS Code/MTSA or this Clause shall be for the Owners' account, except as otherwise provided in this Charter Party.

(b)(i) The Charterers shall provide the Owners and the Master with their full style contact details and, upon request, any other information the Owners require to comply with the ISPS Code/MTSA. Where sub-letting is permitted under the terms of this Charter Party, the Charterers shall ensure that the contact details of all sub-charterers are likewise provided to the Owners and the Master. Furthermore, the Charterers shall ensure that all sub-charter parties they enter into during the period of this Charter Party contain the following provision:



**ADDITIONAL CLAUSES TO MV SPOT / KOREA LINE
CHARTER PARTY DATED 11TH MARCH 2008**

*"The Charterers shall provide the Owners with their full style contact details and, where sub-letting is
permitted under the terms of the charter party, shall ensure that the contact details of all sub-charterers are
likewise provided to the Owners".*

(ii) Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by
failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account, except as
otherwise provided in this Charter Party.

(c) Notwithstanding anything else contained in this Charter Party all delay, costs or expenses whatsoever
arising out of or related to security regulations or measures required by the port facility or any relevant
authority in accordance with the ISPS Code/MTSA including, but not limited to, security guards, launch
services, vessel escorts, security fees or taxes and inspections, shall be for the Charterers' account, unless such
costs or expenses result solely from the negligence of the Owners, Master or crew. All measures required by
the Owners to comply with the Ship Security Plan shall be for the Owners' account.

(d) If either party makes any payment which is for the other party's account according to this Clause, the other
party shall indemnify the paying party.

**Clause 97. – U.S Customs Advance Notification / AMS Clause for Time Charter Parties**

(a) If the Vessel loads or carries cargo destined for the US or passing through US ports in transit, the
Charterers shall comply with the current US Customs regulations (19 CFR 4.7) or any subsequent
amendments thereto and shall undertake the role of carrier for the purposes of such regulations and shall, in
their own name, time and expense:

i) Have in place a SCAC (Standard Carrier Alpha Code);

ii) Have in place an ICB (International Carrier Bond);

iii) Provide the Owners with a timely confirmation of i) and ii) above; and

iv) Submit a cargo declaration by AMS (Automated Manifest System) to the US Customs and provide the
Owners at the same time with a copy thereof.

(b) The Charterers assume liability for and shall indemnify, defend and hold harmless the Owners against any
loss and/or damage whatsoever (including consequential loss and/or damage) and/or any expenses, fines,
penalties and all other claims of whatsoever nature, including but not limited to legal costs, arising from the
Charterers' failure to comply with any of the provisions of sub-clause (a). Should such failure result in any
delay then, notwithstanding any provision in this Charter Party to the contrary, the Vessel shall remain on
hire.

(c) If the Charterers' ICB is used to meet any penalties, duties, taxes or other charges which are solely the
responsibility of the Owners, the Owners shall promptly reimburse the Charterers for those amounts.

(d) The assumption of the role of carrier by the Charterers pursuant to this Clause and for the purpose of the
US Customs Regulations (19 CFR 4.7) shall be without prejudice to the identity of carrier under any bill of
lading, other contract, law or regulation.



**ADDITIONAL CLAUSES TO MV SPOT / KOREA LINE
CHARTER PARTY DATED 11TH MARCH 2008**

**Clause 98. Bottom Fouling Clause**

In case the vessel's bottom is fouled due to prolonged stay or lay up over 24 days in a port and/or berth and/or anchorage which will affect vessel's performance on speed/consumption, then Owners will not be held responsible for change of vessel's description on speed and/or consumption.

**Clause 99.**

**Dispute Resolution Clause**

**English Law, London Arbitration**

(a)  This Contract shall be governed by and construed in accordance with English law and any dispute arising out of or in connection with this Contract shall be referred to arbitration in London in accordance with the Arbitration Act 1996 or any statutory modification or re-enactment thereof save to the extent necessary to give effect to the provisions of this Clause.

The arbitration shall be conducted in accordance with the London Maritime Arbitrators Association (LMAA) Terms current at the time when the arbitration proceedings are commenced.

The reference shall be to three arbitrators. A party wishing to refer a dispute to arbitration shall appoint its arbitrator and send notice of such appointment in writing to the other party requiring the other party to appoint its own arbitrator within 14 calendar days of that notice and stating that it will appoint its arbitrator as sole arbitrator unless the other party appoints its own arbitrator and gives notice that it has done so within the 14 days specified. If the other party does not appoint its own arbitrator and give notice that it has done so within the 14 days specified, the party referring a dispute to arbitration may, without the requirement of any further prior notice to the other party, appoint its arbitrator as sole arbitrator and shall advise the other party accordingly.  The award of a sole arbitrator shall be binding on both parties as if he had been appointed by agreement.

Nothing herein shall prevent the parties agreeing in writing to vary these provisions to provide for the appointment of a sole arbitrator.

In cases where neither the claim nor any counterclaim exceeds the sum of USD 50,000 (or such other sum as the parties may agree) the arbitration shall be conducted in accordance with the LMAA Small Claims Procedure current at the time when the arbitration proceedings are commenced.

(b)  Notwithstanding the above, the parties may agree at any time to refer to mediation any difference and/or dispute arising out of or in connection with this Contract.

In the case of a dispute in respect of which arbitration has been commenced under the above, the following shall apply:-

(i)  Either party may at any time and from time to time elect to refer the dispute or part of the dispute to mediation by service on the other party of a written notice (the "Mediation Notice") calling on the other party to agree to mediation.

(ii)  The other party shall thereupon within 14 calendar days of receipt of the Mediation Notice confirm that they agree to mediation, in which case the parties shall thereafter agree a mediator within a further 14 calendar days, failing which on the application of either party a mediator will be appointed promptly by the Arbitration Tribunal ("the Tribunal") or such person as the Tribunal may designate for that purpose. The mediation shall



## ADDITIONAL CLAUSES TO MV SPOT / KOREA LINE
## CHARTER PARTY DATED 11TH MARCH 2008

be conducted in such place and in accordance with such procedure and on such terms as the parties may agree or, in the event of disagreement, as may be set by the mediator.

**(iii)** If the other party does not agree to mediate, that fact may be brought to the attention of the Tribunal and may be taken into account by the Tribunal when allocating the costs of the arbitration as between the parties.

**(iv)** The mediation shall not affect the right of either party to seek such relief or take such steps as it considers necessary to protect its interest.

**(v)** Either party may advise the Tribunal that they have agreed to mediation. The arbitration procedure shall continue during the conduct of the mediation but the Tribunal may take the mediation timetable into account when setting the timetable for steps in the arbitration.

**(vi)** Unless otherwise agreed or specified in the mediation terms, each party shall bear its own costs incurred in the mediation and the parties shall share equally the mediator's costs and expenses.

**(vii)** The mediation process shall be without prejudice and confidential and no information or documents disclosed during it shall be revealed to the Tribunal except to the extent that they are disclosable under the law and procedure governing the arbitration.

*(Note: The parties should be aware that the mediation process may not necessarily interrupt time limits.)*

- END -



# SPOT SHIPPING LTD.

## HIRE STATEMENT OF ACCOUNTS - 54

## MV SPOT
### KOREA LINE (SINGAPORE) PTE LTD
#### CP DTD 11.03.2008

| PARTICULARS | | | | | | DEBIT | CREDIT |
|---|---|---|---|---|---|---|---|
| 1 . HIRE | From [ GMT ]<br>22-02-2011 3:30 - | To [ GMT ]<br>09-03-2011 3:30 = | Days<br>15.00000 x | Daily<br>$45,000 = | Total<br>$675,000.00 | $675,000.00 | |
| 2 . ADD. COMM. | | | 2.50% x | $675,000 = | $16,875.00 | | $16,875.00 |
| 3 . CABLE / ENTERTAINMENT / VICTUALLING | | $1,200 x | 15.00000 / | 30.00000 = | $600.00 | $600.00 | |
| | | | | | | $675,600.00 | $16,875.00 |
| DUE TO   O W N E R S | | | | | | | $658,725.00 |
| G R A N D   T O T A L | | | | | [ E&O.E ] | $675,600.00 | $675,600.00 |



EXHIBIT
B